UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JANE DOE, a fictitious name, on behalf of
herself and all others similarly situated,

              Plaintiffs,

     - against -

JOHN B. RHODES, GREGG C. SAYRE,
DIANE X. BURMAN, JAMES S. ALESI and
the NEW YORK STATE PUBLIC SERVICE
COMMISSION,

              Defendants.

---

Civil Action No.:  5:17-cv-936 (DNH/TWD)

## CLASS ACTION COMPLAINT

1.      Plaintiff, Jane Doe, on behalf of herself and all others similarly situated, brings this Complaint, by and through her attorneys, for declaratory judgment and injunctive relief to enjoin Defendant, the New York State Public Service Commission (hereinafter "PSC"), from enforcing certain orders issued by the PSC, which deny low-income individuals in the State of New York the right to contract with independent energy service companies ("ESCOs") for the provision of gas and electric services in the State of New York—a right that all other New Yorkers enjoy. Such orders deny the members of the class equal protection of the laws and interfere with their right to contract, invade their right of privacy, and deprive them of due process of law. The following allegations are made on information and belief.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Venue is properly in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), as one or more of the Defendants resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## PARTIES

4.      Plaintiff, Jane Doe, resides in Syracuse, New York.  She sues under a fictitious name to protect her privacy.

5.      Upon information and belief, John B. Rhodes is the Chair of the PSC.  He is sued in his official capacity.

6.      Upon information and belief, Gregg C. Sayre is a Commissioner of the PSC.  He is sued in his individual and official capacity because he affirmatively voted to implement the challenged orders of the PSC.

7.      Upon information and belief, Diane X. Burman is a Commissioner of the PSC.  She is sued in her official capacity only, as she objected and voted against imposing the unconstitutional measures at issue.

8.      Upon information and belief, James S. Alesi is a Commissioner of the PSC.  He is sued in his official capacity.

9.      Upon information and belief, Defendant PSC is a New York independent agency consisting of five (5) members appointed by the Governor of the State of New York, by and with the advice and the consent of the Senate.  The PSC has jurisdiction over utilities providing energy services to the citizens of the State of New York pursuant to the New York State Public Service Law.

## FACTUAL BACKGROUND

### New York State Introduces and Encourages Competition in the Retail Energy Market

10.    In the 1990s, the PSC deregulated the energy market in New York State, inviting and encouraging ESCOs to provide an independent source of services for the commodity supply portion of customers' electric and natural gas services. The deregulated market mitigated the monopoly power that utilities in the State held over the commodity supply business by introducing competitive products and options that customers can choose instead of requiring customers to purchase the commodity supply from the utilities. In an Opinion Order entered on May 20, 1996 (PSC case 94-E-0952, Op. No. 9612), the PSC held that ESCOs would be allowed to operate in the State to ensure that "[n]o competitor or group of competitors should be able to exercise undue market power over other competitors."

11.    Since 1996, hundreds of thousands of New York State residents have freely chosen to purchase gas and electric services through ESCOs rather than the utility which holds monopoly power in their community. Until now, consumers were free to choose to receive their electric and gas services either from the utility or one of many ESCOs. In response to direct advertising from ESCOs, or through the PSC's own website which provides information to consumers about the various options available in their community and provides comparative pricing, consumers have been able to exercise their freedom of choice in selecting an energy service provider.

12.    In addition to providing an alternative to the monopoly utilities, ESCOs also provide numerous services and options that energy consumers cannot get from the local utility in their area, including: fixed-price contracts that protect the consumer from fluctuations in

price; the ability to purchase "green" or renewable energy; services and incentives for reducing energy consumption; and various loyalty discounts.

13.    Over the last two decades, ESCOs have saved New Yorkers billions of dollars in the form of lower energy costs and energy-related discounts and product offerings, as the PSC itself has recognized. ESCOs have also reduced the amount of non-renewable energy consumed by increasing the percentage of "green" or renewable energy options available to, and used by, consumers—something many New Yorkers (regardless of their income levels) believe to be critical to society's sustainable future.

14.    The PSC maintains a website that allows New York customers to compare and contrast the many offering of different ESCOs against the local utility. This website is called "Power to Choose," and can be accessed on the internet at www.newyorkpowertochoose.com. Customers who are given the "Power to Choose" can compare rates and options by clicking a button on the internet; and can save substantial amounts of money and avoid fluctuation in their energy supply cost.

**The PSC Targets Low-Income New York Residents**

15.    Despite the increased competition and the availability of consumer choice, the PSC has now, through a series of orders, sought to eliminate the right to choose an energy provider for certain citizens based on their financial status. Specifically, the PSC has issued a series of orders that forces all low-income consumers to purchase energy from the monopoly utility provider in their community, and deprives them of the right to choose to buy or continue to buy from an ESCO (or to continue buying from an ESCO that has been providing them services for years).

16.    Certain individuals, including Plaintiff, are eligible to receive federal low-income assistance to help pay for their utility bills under the Home Energy Assistance Program

("HEAP") adopted pursuant to the federal Low Income Home Energy Assistance Act, 42 U.S.C. § 8621 *et. seq.* These HEAP payments amount to between $250 and $400 per eligible household, for the year, and are applied to the "delivery" portion of the consumer's bill. Consumers pay that "delivery" fee to the monopoly utility—irrespective of whether they purchase energy supply from the utility or from an ESCO; the HEAP payment is not paid to or passed through to ESCOs, who do not offer delivery services. Individuals who receive HEAP assistance also receive a small reduction in the utilities' own delivery fee. These individuals have been identified by the PSC as "Assistance Program Participants" or "APPs."

17.    Between HEAP and the reduction in delivery charges for income-eligible utility customers, low income customers' energy bills may be reduced by between 15 and 20 percent. The rest of the energy bill—including all of the supply charges—is paid from low-income customers' own funds.

18.    The federal HEAP Act requires that, in order for a state to receive funds pursuant to HEAP, the state must submit a plan on an annual basis for distribution of those funds. 42 U.S.C. § 8624(c). New York's HEAP program clearly and unequivocally promises confidentiality protection to low income consumers, stating:

> All personally identifying information about a HEAP applicant or recipient is confidential and may be disclosed only for purposes of investigating or prosecuting suspected fraud or abuse, in cooperation with Federal or State authorities regarding LIHEAP audits or investigations, or with the written consent of the applicant or recipient.

New York HEAP Manual, at Chapter 23 (https://otda.ny.gov/programs/heap/heap-manual.pdf [emphasis in original]).

19.    Federal regulations governing Social Security Income ("SSI") recipients—most of whom qualify as APPs by virtue of qualifying for SSI—also prohibit the dissemination of

information about such beneficiaries. None of the PSC's "low-income" Orders fit within the authorized circumstances under which the identities of SSI beneficiaries can be disclosed as specified in 45 C.F.R. § 205.50. In fact, the disclosure of the economic status or circumstances of these SSI recipients is expressly prohibited by 45 C.F.R. § 205.50(a)(2)(i)(B) ("Information related to the social and economic conditions or circumstances of a particular individual[,] including information obtained from any agency pursuant to [HEAP eligibility] . . . must be safeguarded in accordance with procedures set forth by [the IRS and Social Security Administration])."

20.    The New York Office of Temporary and Disability Assistance ("OTDA") recognizes the significance of this confidentiality commitment in Chapter 23 of its HEAP Manual, noting that "HEAP applicants/recipients have an expectation of privacy when they apply for a government program of assistance." See HEAP Manual, available at http://otda.ny.gov/programs/heap/HEAP-manual.pdf.

**The PSC Orders the Elimination of Energy Choice Rights for Low-Income Customers**

21.    On July 15, 2016, the PSC issued an Order prohibiting ESCOs from continuing to service APPs in the State of New York. The supposed justification for this Order was the claim by the PSC that ESCOs were charging their customers much more than the utilities for electric and gas service. This Order was issued without any detailed study supporting such an assertion and without the PSC following the State Administrative Procedure Act.

22.    The other justification for the PSC's precipitous action was a conclusion, unsupported by any evidence, that "unsuspecting retail customers, and particularly APPs" were overpaying "unwittingly;" that is, that the PSC decided that low-income customers did not have the ability to think for themselves or exercise their independent judgment to choose the energy providers that best serves their needs.

23.    Pursuant to the July 15, 2016, Order, low-income customers can no longer elect to sign up for fixed-rate agreements or agreements for the purchase of renewable "green" energy. Low-income customers will be forced to purchase energy from a single local utility servicing their geographic region, subject to variable-rate pricing that is impossible to forecast.

24.    The July 15, 2016, Order was self-stayed by the PSC in response to concerns raised about the PSC adopting the order in violation of the New York State Administrative Procedure Act (SAPA).    But on September 19, 2016, at the very same time that the PSC suspended implementation of the July 15, 2016, Order, the PSC re-adopted the very same measure as an "Emergency Order" and ordering ESCOs to cease servicing low-income customers.    That Order was subsequently stayed by virtue of a Temporary Restraining Order ("TRO") entered by the New York State Supreme Court, Albany County, in two actions brought by various ESCOs and trade associations challenging the decision.

25.    Then, on December 16, 2016, while the TRO was pending, the PSC again (for a third time) issued an Order prohibiting ESCOs from providing any service to low-income customers.    After a series of stays, the PSC announced that it was moving forward with the December 16, 2016, Order on June 30, 2017—after a state court dismissed Article 78 petitions filed by certain ESCOs challenging the Order.    The Court's decision dismissing those Article 78 petitions is now the subject of a pending appeal to the Appellate Division, Third Department, of State Supreme Court.    The Appellate Division issued a temporary stay of the lower court decision on August 10, 2017.

26.    Neither Plaintiff nor any other Class Member is a party to these state court proceedings.

7

27.    All of Defendants' administrative orders have been entered without even an evidentiary hearing to determine whether ESCOs, in fact, overcharge customers for energy services.  And the PSC has entered these blanket orders without making a determination as to whether each particular ESCO was, in fact, overcharging customers; or whether the affected consumers were realizing savings or benefits as a result of their choosing to enroll with an ESCO.

28.    Instead, the PSC allowed ESCOs to seek a "waiver" from its orders on the condition that they *guarantee* that they will, for the term of any contract, not charge their customers any more than the rates the monopoly utility in the particular community claims to charge for supply.  However, those utility rates are not tied to any market indices, and are highly discretionary, non-transparent, variable rates that are determined by individual utility staff.

29.    In fact, only <u>after</u> entering the December 16, 2016, Order, the PSC commenced a lengthy evidentiary proceeding to, among other things, gather the evidence needed to assess the impact that ESCOs have on customers and the New York State energy market; and to ascertain whether and to what extent customers benefit from being able to choose their energy provider (the "2017 Evidentiary Proceeding").  That 2017 Evidentiary Proceeding is ongoing, with initial testimony set to be submitted later this month, and evidentiary hearings set for November 2017. The PSC has issued hundreds of requests for information in that proceeding, including for pricing information and data regarding the many value-add programs that ESCOs offer.  That information is still being gathered, after which it will be analyzed and presented.

30.    The December 16, 2016, Order not only prohibits ESCOs from enrolling any low-income customers, but orders ESCOs to terminate their relationships with current customers whose income is low.  For accounts that have a definitive term, the Order requires that the

relationship forcibly be terminated when the term expires. For ongoing agreements that do not expire that adjust rates on a monthly basis (as the utilities do), which, upon information and belief, are the vast majority of such ESCO agreements, the Order requires ESCOs to terminate each customer within thirty (30) days of receiving notice that the customers are being "de-enrolled."

31.     The December 16, 2016, Order is apparently based on the assumption that, simply because a customer has a low net worth, the customer is not able to decide for himself or herself the best or most economical way to receive utility services. It forces such customers to purchase energy only from the monopoly utility in their community and deprives such customers of the right to choose for themselves their own products and provider—in clear violation of the United States and New York State Constitutions. It also eliminates those customers' abilities to lock in fixed rates for energy, support renewable energy products for their homes or to obtain loyalty discounts, reward points, and gift cards offered through some ESCO programs..

32.     The PSC has promulgated a set of rules known as the Uniform Business Practices (UBP) to provide for consistent business procedures for utilities and ESCOs across the state. The UBP expressly prohibits a practice known as "slamming"—which is defined as a change of a customer from one energy provider to another without that customer's authorization:

> Unauthorized Customer Transfers. A change of a customer to another energy provider without the customer's authorization, commonly known as slamming, is not permitted. The distribution Case 98-M-1343 SECTION 5 -32- utility shall report slamming allegations to the Department on at least a monthly basis.

Uniform Business Practices § 5-K. The PSC's December 16, 2016, Order specifically directs utilities to forcibly enroll low-income customers with a provider (the local utility) without that customer's authorization and against that customer's will.

**After Eliminating Low-Income Customers' Right To Choose an Energy Provider, the PSC Commences an Evidentiary Proceeding To Gather the Evidence Needed To Determine Whether and to What Extent Customers Benefit from Having the Right To Choose**

33.     The December 16, 2016, Order also discriminates against low-income customers by depriving them of the same process other citizens are being afforded with respect to energy choice.    Specifically, as noted above, on December 2, 2016, the PSC noticed the 2017 Evidentiary Proceeding.    That 2017 Evidentiary Proceeding is ongoing, with initial testimony set to be submitted later this month, and evidentiary hearings set for November 2017.  The PSC has issued hundreds of requests for information in that proceeding, including for pricing information and data regarding the many value-add programs that ESCOs offer.    That information is still being gathered, after which it will be analyzed and presented.

34.     Notwithstanding the pendency of the 2017 Evidentiary Proceeding, the PSC has determined that low-income individuals are not entitled to have the requisite evidence gathered, presented, and analyzed before drastic measures are imposed upon them—in contrast to the rest of the population.  This approach is as unconstitutional as it is paternalistic.

35.     The PSC maintains a website that allows New York customers to compare and contrast the offering of different ESCOs against the local utility.  This website is called "Power to Choose," and can be accessed on the internet at www.newyorkpowertochoose.com.  As of August 17, 2017, the website showed that a customer in Syracuse, New York (zip code 13208), for example, could have entered into variable-rate contracts for 3.5¢ per kilowatt hour and fixed-rate contracts with different ESCOs for under 5¢ per kilowatt hour.  That same website also showed that the variable rate charged by the local utility (National Grid) was more than 5¢ per kilowatt hour and that the local utility's rate had increased more than 11% in the last two months alone.  Customers cannot buy fixed prices from the local utility (National Grid).  Thus, customers who are given the "Power to Choose" can save a substantial amount of money and

eliminate their exposure to volatile commodity prices, thereby avoiding fluctuation in their energy supply cost. Such cost savings and budgeting certainty and predictability are particularly important for low-income and fixed-income individuals.

**The PSC Orders the Invasion of Low-Income Customers' Privacy Rights**

36.     The December 16, 2016, Order also substantially invades the privacy rights of such low-income customers under both Federal and State law because it requires the utilities to disclose to ESCOs the income levels of hundreds of thousands of individuals (who are HEAP and subsidy recipients) so that the ESCOs will terminate those accounts. ESCOs in turn are required to further violate those customers' privacy rights by sharing that information with the many employees and contractors who are involved with enrolling customers in ESCO products.

37.     The PSC has already recognized that it would violate low-income customers' privacy rights if information regarding the identity of low-income customers was provided to ESCOs. The PSC had convened a collaborative "to determine a mechanism by which utility low income customers could be identified" given the privacy laws preventing such disclosure, and "because of the difficulty identifying those low income customers because of confidentiality requirements," consumer advocates proposed implementing any changes across the board. National Energy Marketers Association v. N.Y. Pub. Svc. Commission, --- N.Y.S.3d ----, 2016 WL 4004502 (Sup. Ct. Albany Cnty. July 22, 2016), at *4.

38.     The PSC did not devise a mechanism for permissibly identifying low-income customer accounts for ESCOs. Instead, it ignored those laws and disregards low-income customer privacy rights and interests by directing utilities and ESCOs to disseminate such confidential information.

39.     Section 9 of New York State's HEAP Plan provides that:

> [e]ach home energy vendor must sign a New York State HEAP vendor agreement to participate in both the regular and emergency components of HEAP.  The vendor agreement provides that the home energy vendor agrees and assures to the…[OTDA] that households served by the vendor will not be treated adversely because of such assistance under applicable provision of State law or public regulatory requirements.

40.     Accordingly, OTDA's model vendor agreement for suppliers of home heating fuels requires that "Households receiving assistance from HEAP will not be treated adversely because of such assistance under applicable provisions of State law and public regulatory requirements."  See Vendor Agreement, available at https://otda.ny.gov/programs/heap/ documents/Vendor-Agreement-Non-Utility.pdf.  The December 16, 2016, Order violates this commitment that HEAP participants "will not be treated adversely because of such assistance" by depriving only low-income customers of the freedom to choose their preferred energy provider, including to benefit from long-term fixed-rate plans or green alternatives that only ESCOs offer.

## PLAINTIFF JANE DOE

41.     Plaintiff Jane Doe has been a customer of an ESCO, BlueRock Energy, Inc. ("BlueRock"), for two (2) years.  She receives both gas and electric supply from BlueRock. She chose BlueRock, in part, because she wanted a fixed-rate energy bill so that she could manage her finances.  Under her gas contracts with BlueRock, she has reduced her energy supply costs by approximately 12% during the first half of 2017 alone.  These savings are in addition to the peace of mind she gains under a fixed-price supply agreement, which she chose and which the monopoly utilities do not offer.  She also appreciates the local and responsive customer service she receives to help her in a variety of ways with respect to her energy needs and services.

42.     Plaintiff Jane Doe was unaware of the PSC's unilateral decision to terminate her service from BlueRock until she received a letter on July 28, 2017, from National Grid (the "Forced Termination Letter").  A copy of that Forced Termination Letter is attached here to Exhibit 1.  On information and belief, the PSC required National Grid to send the Forced Termination Letter pursuant to the PSC's December 16, 2016 Order.

43.     Upon receiving the Forced Termination Letter, Plaintiff Jane Doe complained to BlueRock about the termination of her account and expressed her desire to continue her relationship as a customer of BlueRock's.  She was advised by BlueRock that BlueRock was not voluntarily dropping her as a customer, but that the PSC was forcibly de-enrolling her pursuant to its "Low-Income Order."

## THIS ACTION SHOULD BE MAINTAINED AS A CLASS ACTION

44.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

45.     Plaintiff seeks to maintain this action as a class action representing a class (the "Class") consisting of the following ("Class Members"):

> All individuals who are, or have been designated as, eligible for low-income assistance for energy services as defined in the PSC's December 16, 2016 Order, and who have an agreement for the provision of such services by an ESCO or who have sought to enter into such an agreement.

46.     Ascertainability / Numerosity:  This Class is ascertainable in that it is comprised of individuals who can be identified by reference to purely objective criteria contained in the records of the PSC or the electric and gas utilities.  On information and belief, there are approximately 400,000 Class Members, and therefore it would be impractical to bring all or even a substantial portion of such persons before this Court as individual plaintiffs.

47.    <u>Typicality</u>:  The claims of the named Plaintiff are typical of the claims of each Class Member she seeks to represent because:  (1) they all desire to contract with ESCOs and are being barred from doing so by the PSC; (2) they will all been injured by PSC's Order; and (3) each of their claims is based upon the same legal theory, *i.e.*, that the PSC order violates their constitutional and statutory rights.

48.    <u>Adequacy of Representation</u>:  Plaintiff is an adequate representative of the Class she seeks to represent because:  (a) she is willing and able to represent the proposed class and has every incentive to pursue this action to a successful conclusion; (b) her interests are not in any way antagonistic to those of the other Class Members; and (c) she is represented by competent counsel.

49.    <u>Commonality</u>:    There are questions of law and fact common to all Class Members.  The primary question of law and fact that is common to all members of the class is whether the PSC's Order denying Class Members equal protection of the law in violation of the United States and New York State Constitutions is permissible.

50.    <u>Propriety of Class Certification Under Fed. R. Civ. P. 23(b)(2)</u>:    Class certification of all of Plaintiff's claims is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted and/or refused to act on grounds generally applicable to the entire Class, thereby making declaratory and final injunctive relief appropriate.

51.    Requiring each Class Member to pursue his or her claim individually would entail needless duplication of effort, would waste the resources of both the parties and the Court, and would risk inconsistent adjudications.

## FIRST CAUSE OF ACTION
### Denial of Equal Protection Under the U.S. Constitution

52.    Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

53.    Defendants' conduct violates Plaintiff's and the Class Members' rights under the Equal Protection Clause of the United States Constitution, and their rights under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
### Denial of Equal Protection Under the New York State Constitution

54.    Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

55.    Defendants' conduct violates the Plaintiff's and the Class Members' rights to equal protection pursuant to Article I, Section 11 of the New York State Constitution.

## THIRD CAUSE OF ACTION
### Contract Clause of Violation of the U.S. Constitution

56.    Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

57.    The Order directs the cancellation of many existing customers' contracts where those contracts provide for variable pricing: "[W]ith respect to customers on variable rate, month-to-month contracts, the expiration of the agreement is at the end of the current billing period." Many variable rate contracts are long-term contracts, in which the parties agreed that the ESCO would reset the rate every month. The contracts have an indefinite term and expire only upon the ESCO or the customer's termination of the contract. The PSC recognizes that variable-rate contracts are continuing contracts by not requiring compliance with its enrollment procedures

under the Uniform Business Practices. Yet the PSC has directed all ESCOs to terminate such contracts.

58.     Defendants' conduct violates Plaintiff's and the Class Members' rights under the Contracts Clause contained in Article I, Section 10, Clause 1 of the United States Constitution, and their rights under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
### Violation of the Takings Clause of the New York State Constitution

59.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

60.     Defendants' conduct violates the Takings Clause of Article I, Section 7 of the New York Constitution.

## FIFTH CAUSE OF ACTION
### New York State General Business Law § 349-d(6)

61.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

62.     Defendants' conduct violates the New York State General Business Law § 349-d(6) which prohibits any material change to the terms or the duration of any contract for the provision of energy services by an ESCO "without the express consent of the customer."

## SIXTH CAUSE OF ACTION
### Denial of Due Process: Fifth and Fourteenth Amendments of the U.S. Constitution

63.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

64.     By engaging in the foregoing conduct, including, for example, by failing to give Plaintiff and the Members of the Class notice or a meaningful opportunity to be heard, the Defendants have violated, and unless enjoined will continue to violate, Plaintiff's and the Class's

rights under the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution.

## SEVENTH CAUSE OF ACTION
### Denial of Due Process: Article I, Section 6 of New York State Constitution

65.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

66.     By engaging in the foregoing conduct, including, for example, by failing to give Plaintiff and the Members of the Class notice or a meaningful opportunity to be heard, the Defendants have violated, and unless enjoined will continue to violate, Plaintiff's and the Class's rights under the Due Process Clause of Article I, Section 6 of the New York State Constitution.

## EIGHTH CAUSE OF ACTION
### PSC Acting in Excess of Jurisdiction

67.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

68.     Defendants' conduct exceeds the scope of their authority under New York State law.  Through the Public Service Law (PSL), the New York State Legislature prescribed the scope of the PSC's ability to set rates and limited that authority to ratemaking over monopoly utilities.

69.     By regulating the rates that ESCOs can charge low-income customers, Defendants have undertaken actions pursuant to Article 4 of the PSL, notwithstanding the PSL's limitation of such authority to ratemaking over public utilities.

70.     Plaintiffs and the Class are harmed by Defendants' *ultra vires* acts because those acts have deprived Plaintiffs of their right to choose an energy provider.

## NINTH CAUSE OF ACTION
### Violation of Privacy Rights Under the U.S. Constitution

71.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

72.     Defendants' conduct violates Plaintiff's and the Class Members' rights to privacy as embodied in the United States Constitution; their rights under 42 U.S.C. § 1983; and their statutory privacy rights under HEAP and 45 CFR § 205.50, as set forth above.

## TENTH CAUSE OF ACTION
### Violation of New York State Privacy Rights

73.     Plaintiff re-alleges and incorporates by reference the allegations of all paragraphs above as if fully set forth herein.

74.     Defendants' conduct violates Plaintiff's and the Class Members' rights of privacy under the New York State Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

1.     Preliminarily and permanently enjoining Defendants, their staff and those acting in concert with them from enforcing or seeking to enforce or implementing any of the PSC orders relating to termination of low-income customers including, but not limited to, the PSC's December 16, 2016 Order.

2.     Declaring that the orders of the PSC including the December 16, 2016 Order are void, unenforceable and violative of Plaintiff's and the Class Members' constitutional and statutory rights.

3.     Awarding Plaintiff and the Class costs and attorneys' fees pursuant to 42 U.S.C. § 1988, Article 86 of the New York Civil Practice Law and Rules, and other applicable provisions.

4.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all issues so

triable if this Court determines that any issue in this matter is appropriate for a jury trial.

Date:   August 23, 2017                    By:     _____
        Albany, NY

                                           **GLEASON, DUNN, WALSH & O'SHEA**
                                           Thomas F. Gleason, Esq.
                                           Bar Roll No.  101791
                                           Richard C. Reilly, Esq.
                                           Bar Roll No.  513055
                                           40 Beaver Street
                                           Albany, NY 12207
                                           Ph: (518) 432-7511
                                           Email: tgleason@gdwo.net
                                                  rreilly@gdwo.net